FILED & ENTERED

APR 08 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY penning   DEPUTY CLERK

<u>NOT FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>DALE ALFRED WILLIAMS,<br><br>                   Debtor. | Case No. 2:12-bk-15652-RK<br><br>Chapter 11<br><br>**FINDINGS OF FACT ON PHASE 1 OF TRIAL ON DEBTOR'S OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE [CLAIM NO. 11-3] AND MOTION OF DEBTOR FOR AN ORDER DETERMINING CERTAIN TAX LIABILITY OF THE ESTATE PURSUANT TO SECTION 505(a) OF THE BANKRUPTCY CODE [ECF 695]** |

The contested matter of the Objection to Claim of Internal Revenue Service [Claim No. 11-3] and Motion of Debtor For an Order Determining Certain Tax Liability of the Estate Pursuant to Section 505(a) of the Bankruptcy Code (the "Claim Objection") of Debtor Dale Alfred Williams ("<u>Debtor</u>"), Electronic Case Filing Number ("ECF") 695, filed in this bankruptcy case on December 5, 2013, came on for phase 1 of trial ("Phase 1") before the undersigned United States Bankruptcy Judge on June 1 and 2, 2017. Appearing for Debtor were William N. Lobel, formerly of the law firm of Lobel, Weiland, Golden & Friedman, LLP, and presently of the law firm of Pachulski, Stang, Ziehl & Jones, LLP, and Minna C. Yang and Christian A. Speck, of the law firm of Wagner, Kirkman, Blaine, Klomparens & Youmans, LLP.  Appearing for the United States of America (the

-1-

"United States"), on behalf of its agency the Internal Revenue Service (the "IRS" and, collectively with the Unites States, the "Government"), were Assistant United States Attorneys Benjamin L. Tompkins and Najah J. Shariff.

Before trial, the parties filed a *Joint Pre-Trial Stipulation* on March 31, 2017, ECF 1329, which the court approved by its order entered on April 14, 2017, ECF 1332. On August 2, 2017, the United States lodged its proposed findings of fact and conclusions of law, *see* ECF 1359, and Debtor lodged his proposed findings of fact and conclusions of law, *see* ECF 1360 and his Errata thereto, *see* ECF 1361. On August 18, 2017, Debtor filed his objections to the United States' proposed findings of fact and conclusions of law, ECF 1363, and the United States filed its objections to Debtor's proposed findings of fact and conclusions of law, ECF 1362. The court then took the matter under submission, and it is ripe for decision.

Having considered the evidence admitted at trial, the oral and written arguments of the parties, and other admissible and relevant pleadings filed in this matter filed by Debtor and the United States, the court makes the following findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure. The findings set forth herein are subject to a final determination upon conclusion of Phase 2 of the trial.

## I.   **FINDINGS OF FACT**

### A.   **Procedural History**

1.      On May 27, 2011, Debtor commenced this bankruptcy case by filing a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code, Title 11 of the United States Code (U.S.C.). *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 14.

2.      On July 11, 2011, the IRS filed a timely Proof of Claim Number 11-1 reflecting the liability of Debtor claimed for unpaid federal income taxes in the amount of $13,362.80 as a priority tax claim for the tax years 2008 and 2010 with date tax assessed

as "pending examination" with respect to the 2008 tax year. *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 15.

3.      On November 23, 2011, the IRS filed an amended Proof of Claim Number 11-2 which increased the amount of its claim for federal income taxes for tax year 2008 as follows:  principal tax of $2,415,778, prepetition interest of $206,789.96, and tax penalty of $314,051.14. *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 16.

4.      On April 2, 2013, the IRS filed a further amended Proof of Claim Number 11-3 which amended the tax year of its income tax claim from 2008 to 2006 without changing the amounts of the claim. *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 17.

5.      Proofs of Claim Numbers 11-1, 11-2, and 11-3 are hereinafter collectively referred to as the "IRS Claim," with the amount and tax year of the IRS's last amended claim contained in Proof of Claim Number 11-3. *Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 20.

6.      After the IRS concluded its audit examination of Debtor's federal income tax liability in December 2012, on or about April 5, 2013, the IRS made a so-called "quick" assessment  of federal income taxes against Debtor for tax year 2006 in the amount of $2,415,779 in principal tax and interest in the amount of $349,642.89. *Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 18; *2006 Form 4340, Certificate of Assessments and Payments*, Joint Exhibit 9;[1] *Trial Declaration of Andrew Drysdale ("Drysdale Trial Declaration")*, filed on May 11, 2017, ECF 1337, ¶ 21.

7.      The IRS contends that pursuant to the Internal Revenue Code, the income tax liability of Debtor based on its disallowance of a tentative refund from a net operating loss carryback after audit arises in tax year 2006, not tax year 2008. *See USA's Proposed Findings and Conclusions*, ECF 1359 at 13, ¶ 41.  The IRS asserts that the following timeline sets forth the events relating to its processing of Debtor's tentative refund and its disallowance:

---

[1] The trial exhibits were submitted jointly by both parties and are referred to herein as "Joint Exhibits."

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

a. November 12 , 2007 – the IRS issues a refund of Debtor's overpayment of tax of $492,924 for tax year 2006;

b. November 14, 2008 – the IRS issues a refund of Debtor's overpayment of tax of $1,129,975 arising from his first claimed net operating loss (NOL) carryback from tax year 2007 to tax year 2006 and the resulting abatement of tax;

c. June 10, 2009 – the IRS issues a refund of Debtor's claimed overpayment of tax of $2,415,779 arising from his second NOL carryback from tax years 2008 to 2006 and the resulting abatement of tax;

d. April 5, 2013 – the IRS makes a deficiency assessment of tax of $2,415,779 for tax year 2006 based on its disallowance of Debtor's NOL carryback from tax year 2008, which had been previously refunded; and

e. April 5, 2013 – the IRS makes an assessment of interest of $349,642 attributable to the deficiency assessment of tax of $2,415,779 for tax year 2006 based on its disallowance of Debtor's 2008 NOL carryback from tax year 2008.

*See USA's Proposed Findings and Conclusions*, ECF 1359 at 13, ¶ 41; *2006 Form 4340, Certificate of Assessments and Payments*, Joint Exhibit 9; *Drysdale Trial Declaration*, ECF 1337, ¶ 22.

8.       The IRS made its "quick" assessment of income tax and interest on April 5, 2013 pursuant to its authority under 26 U.S.C. § 6213(b)(3) and did not issue a statutory notice of deficiency relating to the assessment pursuant to 26 U.S.C. § 6212.  *Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 19.  However, the IRS did issue to Debtor a notice of the assessment (statutory notice of balance due) on IRS Form 3552, which provided notice to him of the assessment of tax and interest for tax year 2006 with respect to his federal income tax liability reported on his Form 1040 for that year and indicated that if he had any questions he, or anyone else representing him, could call the number listed on the form notice.  *Form 3552, Notice of Tax Due on Federal Tax Return*, Joint Exhibit 15;

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

*Drysdale Trial Declaration*, ECF 1337, ¶ 21.  IRS records do not indicate that the IRS

received any calls from Debtor or his representatives related to this form notice.  *Drysdale*

*Trial Declaration*, ECF 1337, ¶ 21.

9.      On December 5, 2013, Debtor filed his Objection to the IRS Claim, ECF 695.

*See Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 21.

10.      On December 23, 2013, the Government filed its Opposition to Debtor's

Objection to the IRS claim (the "Opposition"), ECF 750.  *See Joint Pre-Trial Stipulation*,

ECF 1329 at 4, ¶ 22.  The Opposition was filed by the United States Attorney's Office in

defense of the interests of the United States, on behalf of its agency, the IRS.  *Joint Pre-*

*Trial Stipulation*, ECF 1329 at 4, ¶ 22.  In the Opposition, the Government contended that

this court lacked jurisdiction to grant Debtor the relief afforded under IRS Revenue

Procedure ("Rev. Proc.") 2011-34 invoked by him and that he should have pursued such

relief administratively with the IRS prior to filing his claim objection.  ECF 750 at 27-28.

11.      On December 31, 2013, Debtor filed his Reply to the Opposition (the

"Reply"), ECF 761.  *See Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 23.

12.      On January 28, 2014, this court held a hearing on Debtor's Claim Objection

wherein it ruled that the Claim Objection would be treated as a contested matter pursuant

to Federal Rule of Bankruptcy Procedure 9014.  *See Joint Pre-Trial Stipulation*, ECF 1329

at 4, ¶ 24.

13.      On April 25, 2014, Debtor filed his First Amended and Restated Complaint

for Declaratory Relief and Disallowance of Claim relating to the IRS claim, ECF 926.  *See*

*Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 25.

14.      On May 23, 2014, the United States served and filed its Answer to Debtor's

First Amended and Restated Complaint for Declaratory Relief and Disallowance of Claim,

ECF 963.  *See Joint Pre-Trial Stipulation*, ECF 1329 at 4, ¶ 26.  In its answer, the United

States reiterated its affirmative defense that the court lacks jurisdiction to grant Debtor the

relief that he claims that he is entitled to pursuant to Rev. Proc. 2011-34, specifically, that

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  he is permitted to make a late election to be treated by the IRS as a qualified real estate

2  professional ("QREP").  *See* ECF 963 at 11, ¶¶ 194-195.

3        15.    In the litigation related to the Claim Objection before this court, including

4  Debtor's claim that the court should grant him relief under Rev. Proc. 2011-34, the United

5  States has been represented by the United States Department of Justice by either Special

6  Assistant United States Attorneys or Assistant United States Attorneys as reflected on the

7  record in this case.  *Joint Pre-Trial Stipulation*, ECF 1329 at 4-5, ¶ 27.

8        **B.**    **Debtor's Background**

9        16.    At trial, Debtor gave testimony about his background, which is largely

10  undisputed, though the United States objected to such testimony on grounds of relevance,

11  which objection the court has overruled.

12        17.    Debtor's career in real estate began immediately after he graduated with a

13  bachelor's degree from University of California at Berkeley.  *Declaration of Dale Alfred*

14  *Williams*, filed on April 27, 2017, ECF 1336, as amended by *Revised Declaration of Dale*

15  *Alfred Williams*, ECF 1348 *("Williams Trial Declaration")*, filed on June 1, 2017, ¶ 4;

16  *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 41:11-14.

17        18.    Debtor began working for a real estate firm called Kahn Construction where

18  he developed skills that fostered his desire to develop and to acquire real estate.  *Williams*

19  *Trial Declaration*, ECF 1348, ¶¶ 8, 10.  With the skills and the contacts Debtor acquired

20  from Kahn Construction, Debtor built a large mobile home park in Simi Valley with his

21  parents and other investors.  *Id.*, ¶ 14.

22        19.    Debtor continued building and managing mobile parks and eventually

23  expanded his business to the condominium building arena where he focused his

24  development activities in inland areas after according to Debtor, suffering a major setback

25  when the California Coastal Commission was formed.  *Williams Trial Declaration*, ECF

26  1348, ¶¶ 16, 18-19.

27

28

-6-

1   20.   Debtor continued with building projects (in Santa Monica, Simi Valley, San

2   Fernando Valley, Hanford, and Sacramento) and began hiring employees to help in his

3   business as operations grew. *Williams Trial Declaration*, ECF 1348, ¶¶ 19-21.

4   21.   According to Debtor, while working in real estate, he obtained a pilot's

5   license which allowed him to fly small planes and broaden his geographic scope of his

6   business. *Williams Trial Declaration*, ECF 1348, ¶ 21.

7   22.   Debtor expanded his real estate operations and owned properties in other

8   states, including Texas, Louisiana, Florida, Ohio, and Tennessee. *Williams Trial

9   Declaration*, ECF 1348, ¶¶ 23-24; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF

10   1354 at 12:16-25.

11   23.   Debtor expanded his real estate operations into buying and building mini-

12   storage facilities and business parks, and he also took on larger projects, which often

13   began as a partnership with Debtor contributing his expertise in subdivisions. *Williams

14   Trial Declaration*, ECF 1348, ¶ 22, 24.

15   24.   According to Debtor, he has never made any substantial money from

16   anything other than in real estate since the 1960s, and he considers himself to be a real

17   estate professional. *Williams Trial Declaration*, ¶ 3; *Williams Testimony, Trial Transcript,

18   June 2, 2017*, ECF 1354 at 6:25-7:6.

19   **C.   Debtor's Business Activities and Leasco**

20   25.   For several decades, including in 2008, Debtor has owned interests in rental

21   real estate (each a "Rental Real Estate Property"), by and through approximately fifty

22   different pass-through entities ("Rental Real Estate Entities"). *Joint Pre-Trial Stipulation*,

23   ECF 1329 at 5, ¶ 28; *Williams Trial Declaration*, ECF 1348, ¶ 31. For many years, Debtor

24   also owned interests in oil, gas, and mineral properties, aircraft, and other property

25   through pass-through entities ("Other Entities"). *Id.*

26   26.   For various business reasons, including lender requirements, Debtor

27   acquired real estate through limited partnerships and limited liability, and he owned at

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  least a majority interest in each real estate entity even when other investors were

2  involved. *Williams Trial Declaration*, ECF 1348, ¶ 31.

3      27.    On or about October 23, 1996, Debtor formed Leasco Management

4  Company, Ltd. ("Leasco Management"), a Nevada limited partnership, to serve as general

5  partner and provide management services to the Real Estate Entities. *Williams Trial*

6  *Declaration*, ECF 1348, ¶ 26.  In some of the Real Estate Entities, Debtor serves

7  individually as the general partner or manager. *Id*.

8      28.    Debtor has held at least a majority interest in, and served as president for,

9  several other pass-through entities that provided services exclusively for the benefit of the

10  Rental Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 27.  Debtor generally

11  refers to these management service entities as "Leasco" or "Leasco Management". *See*

12  *id.*

13      29.    Leasco Management began in Sacramento, California and maintained

14  offices in Northern California, Southern California, and Central Florida in 2008. *Williams*

15  *Trial Declaration*, ECF 1348, ¶ 32.

16      30.    During the relevant years, when Debtor was not traveling to visit the property

17  sites owned by the Real Estate Entities, he worked out of the Southern California office

18  supervising and overseeing operations of the Real Estate Entities. *Williams Trial*

19  *Declaration*, ECF 1348, ¶ 33.

20      31.    At its height, Leasco employed approximately 125 employees. *Williams*

21  *Trial Declaration*, ECF 1348, ¶ 34.  In 2008, Leasco still had over 100 employees. *Id*.

22      32.    Although Leasco employed other officers and persons in supervisory

23  positions, however, Debtor as president of Leasco managed and oversaw the activities of

24  all employees. *Williams Trial Declaration*, ECF 1348, ¶ 34.

25      33.    Debtor testified that in his capacity as President of Leasco Management, he

26  supervised all aspects of operation and management of the Real Estate Entities and

27  related management entities. *Williams Trial Declaration*, ECF 1348, ¶ 39.  His

28  responsibilities included: planning, hiring, firing, supervising, and inspecting any phase of

-8-

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

construction or remodeling; buying and selling properties; inspecting prospective new properties; preparing and reviewing offerings; arranging financing; closing escrow; overseeing maintenance and repair work; approving repairs and invoices; hiring and training on-site managers; finding tenants through advertisement or brokers; negotiating rental and lease agreements; negotiating extensions and the refinancing of loans; and hiring and working with legal counsel on any lawsuits involving the Rental Real Estate Entities and/or related management entities. *Williams Trial Declaration*, ECF 1348, ¶ 39.

34.    Attached as Exhibit B to the *Williams Trial Declaration* is the Leasco Management organizational chart, which identifies Debtor as president as well as the persons and positions that Debtor manages and supervises. *Williams Trial Declaration*, ECF 1348, ¶ 34; *Leasco Management Organizational Chart*, Exhibit B to ECF 1336.

35.    Attached as Exhibit 1 to the *Joint Pre-Trial Stipulation* is a summary of Debtor's interests in the Rental Real Estate Entities as well as Debtor's Other Entities, including Fayetteville Shale, LLC, RS Minerals, LLC, Leasco Realty Co., Inc., Leasco Aviation 405DW, Inc, and Leasco Real Estate Investments LLC. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 29; *Williams Trial Declaration*, ECF 1348, ¶ 31.

36.    With regard to Debtor's Rental Real Estate Property, Debtor owns interests in "mobile home entities," "mini storage entities," and "commercial entities." *Joint Pre-Trial Stipulation*, ECF 1329 at 5, ¶ 29.

37.    As stated in Exhibit 1 to the *Joint Pre-Trial Stipulation*:

a.    A "mobile home entity" is (i) a limited partnership or a limited liability company owning an interest in an identified mobile home park, or (ii) a pass-through entity serving as general partner or manager of (i) above. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 30;

b.    A "mini storage entity" is (i) a limited partnership or a limited liability company owning a mini storage facility, or (ii) a pass-through entity serving as

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

general partner or manager of (i) above. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 31; and

      c.     A "commercial entity" is (i) a limited partnership or a limited liability company owning commercial real estate, or (ii) a pass-through entity serving as general partner or manager of (i) above. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 32.

38.    The Rental Real Estate Properties are located in multiple states including California, Nevada, Arizona, Texas, Mississippi, Tennessee, Ohio, and Florida, with the locations further identified in Exhibit 1 to the *Joint Pre-Trial Stipulation*. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 33; *Williams Trial Declaration*, ECF 1348, ¶ 31.

39.    Exhibit 1 to the *Joint Pre-Trial Stipulation* identifies any third-party management companies who were contracted with to manage a particular Rental Real Estate Property. *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *see also id.* at 5, ¶ 34.

40.    Debtor testified that although certain properties have independent third-party management companies under contract, Leasco and Debtor are nonetheless required to provide substantial services to these Rental Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 29. In cases where local access to the tenant pool is required and/or Debtor has no employees in the area, use of third-party management companies may be appropriate. *Williams Trial Declaration*, ECF 1348, ¶ 29. However, Leasco and Debtor apparently remain active in the management, strategies, and decision-making processes involving these properties. *Williams Trial Declaration*, ECF 1348, ¶ 29.

41.    Debtor testified that Leasco Management provided the following functions, among others, to the Real Estate Entities: obtaining construction loans and permanent financing; construction management supervision; hiring and training on-site managers; providing all documents used by on-site personnel in leasing and managing their properties; accounting, including accounts receivable, accounts payable and payroll

-10-

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

supervision; human resources; training sessions to keep managers up to date on policies and procedures; information technology; obtaining property and casualty insurance and termite and pest control contracts; overseeing major repairs; preparing marketing materials and newspaper, radio, television and internet advertising. *Williams Trial Declaration*, ECF 1348, ¶ 35.

42.    Debtor testified at trial that he has worked on a full-time basis with Leasco Management since its formation in 1996, usually working over 40 hours per week and at least 1,500 hours per year. *Williams Trial Declaration*, ECF 1348, ¶ 36; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 70:12-15.  Debtor also testified that he had no other employment unrelated to Leasco Management and the Rental Real Estate Entities during the relevant years. *Williams Trial Declaration*, ECF 1348, ¶ 36. Debtor also testified that for many years, including 2006 and 2008, he spent at least 750 hours per year providing personal services involved development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, and sale of real estate, and all such professional services were for the benefit of the Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 37.  Debtor also testified that since Leasco provided services only to rental real estate in which he owned a majority interest, for all relevant years including 2006 and 2008, Debtor spent at least 500 hours per year engaged in personal services with respect to the Rental Real Estate Entities and the management entities (over and above any hours spent relating to oil and gas), such services including but not limited to obtaining construction loans and permanent financing; construction management supervision; providing all documents used by on-site personnel in leasing and managing their properties; accounting, including accounts receivable and accounts payable; approving property and casualty insurance; overseeing major repairs; preparing marketing materials and newspaper, radio, television and internet advertising with respect to the Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 38.

43.    Debtor's testimony was corroborated by the testimony of Lori Brenning, who has been employed by Debtor or one of his affiliated entities since 1987 and has been

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

responsible for keeping and maintaining those entities' books and records.  *See Declaration of Lori Brenning*, filed on April 27, 2017, ECF 1334, as amended by *Revised Declaration of Lori Brenning ("Brenning Trial Declaration")*, filed on May 30, 2017, ECF 1346, ¶¶ 1, 4; *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 153-157. Ms. Brenning testified that Debtor worked full-time as President of Leasco Management, and he was "very involved in the real estate operations."  *Brenning Trial Declaration*, ECF 1346, ¶ 5.  She also confirmed that Debtor's duties were as he described in his declaration.  *Brenning Trial Declaration*, ECF 1346, ¶ 7; *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 167-177, 240-241; *Williams Trial Declaration*, ECF 1348, ¶¶ 37-38.  According to Ms. Brenning, she frequently spoke to Debtor about Leasco's operations, including by phone at least once per day.  *Brenning Trial Declaration*, ECF 1346, ¶¶ 9-10; *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 164-165, 178:7-15.

44.     Nevertheless, despite indications in the evidence received in Phase 1 of the trial regarding the complexity of the business of Leasco and the Rental Real Estate Entities, the volume and number of properties, and the number of employees of Leasco and the Rental Real Estate Entities, which might support a finding that Debtor spent at least 500 hours or some other specific number of hours per year in personal services with respect to the Rental Real Estate Entities and the management entities, the court finds that the evidence in Phase 1 is inconclusive to show by a preponderance of the evidence that Debtor worked 500 or another specific number of hours per year with respect to the Rental Real Estate Entities and the management entities.  Debtor's primary evidence of the number of hours he worked per year for the benefit of the Rental Real Estate Entities is his trial declaration, which he admitted at trial that he relied upon his counsel to prepare, that he only "lightly" reviewed the trial declaration, that he read the trial declaration over, but did not examine it, and when Debtor was asked if he knew the statements in his trial declaration were accurate, he could only state that he "assume[d]" that it was.  *Williams Testimony, Trial Transcript, June 1, 2017,* ECF 1355 at 280.  Moreover, Debtor stated that

-12-

1    he did not recall providing the numbers of hours worked to his attorneys and suggested

2    that the numbers probably came from Ms. Brenning. *Williams Testimony, Trial Transcript,*

3    *June 2, 2017,* ECF 1354 at 55.  Debtor could not recall whether he independently

4    quantified the number of 1500 hours worked per year for Leasco Management as stated

5    in paragraph 36 of his trial declaration.  *Id.*  Debtor did not keep a contemporaneous daily

6    calendar documenting the work he performed on a particular day.  *Id.* at 16. Debtor's

7    employer, Leasco Management, did not keep time for Debtor's work.  *Brenning*

8    *Testimony, Trial Transcript, June 1, 2017,* ECF 1355 at 167.

9       45.      Debtor's primary witness to corroborate his numbers of hours worked for the

10    Rental Real Estate Entities and the management entities was Lori Brenning, his longtime

11    executive assistant.  However, although she worked with him full-time on an ongoing

12    basis for many years, her personal knowledge of the numbers of hours that he worked

13    was limited because she was generally not physically present where he was working

14    because he was located in Southern California and she was located in Northern

15    California, and she did not travel with him on his trips to visit the Rental Real Estate

16    Properties. *Williams Testimony, Trial Transcript, June 2, 2017,* ECF 1354 at 29.  Ms.

17    Brenning attempted to reconstruct Debtor's work hours during 2008 in some calendars

18    based on her review of business records of Leasco, such as emails, invoices flight logs,

19    and her recollection of conference calls and other events during 2008, which were set

20    forth in Joint Exhibits 31 and 32, but Debtor was unable to state that her reconstruction of

21    his work hours in the calendars were accurate.  *Brenning Testimony, Trial Transcript,*

22    *June 1, 2017,* ECF 1355 at 173-189; *Williams Testimony, Trial Transcript, June 2, 2017,*

23    ECR 1354 at 48-52, 71-72.

24       46.      While Debtor's testimony is probative of the number of hours that he worked

25    during tax year 2008, his statements in his testimony were somewhat conclusory and

26    insufficiently corroborated by the evidence received in Phase 1.  Since the parties as

27    agreed will be presenting in Phase 2 evidence on Debtor's material participation in the

28    rental real estate activities, Debtor should have the opportunity to offer further evidence to

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  corroborate his testimony in Phase 1 about the number of hours he worked that was for

2  the benefit of the rental real estate activities.  *See Moss v. Commissioner,* 135 T.C. 365

3  (2010); *Harnett v. Commissioner*, T.C. Memo 2011-191, *affirmed by unpublished opinion,*

4  496 Fed. Appx. 963 (11th Cir. 2012); *Hailstock v. Commissioner,* 2016-146; *Fitch v.*

5  *Commissioner,* T.C. Memo 2012-358; *Merino v. Commissioner,* T.C. Memo 2013-17.

6      **i. Leasco Aviation 405DW, Inc.**

7    47. Leasco Aviation 405DW, Inc. ("Leasco Aviation" or "Leasco Aviation

8  405DW") is a Subchapter S Corporation that has owned two airplanes, various oil, gas,

9  and mineral related investments, and other property.  *Joint Pre-Trial Stipulation*, ECF

10  1329 at 7, ¶ 44; *see Leasco Aviation 405DW Income Tax Returns, 2002-2008*, Joint

11  Exhibits 123-129.

12    48. Debtor testified that he formed Leasco Aviation 405DW in or about 2002 to

13  acquire an aircraft to transport Debtor, employees of Leasco, and other persons involved

14  in the properties owned by the Real Estate Entities to the property sites and other

15  locations that needed to be visited in order to effectively operate and manage the

16  properties.  *Williams Trial Declaration*, ECF 1348, ¶ 42; *Williams Testimony, Trial*

17  *Transcript, June 2, 2017*, ECF 1354 at 17:11-21.

18    49. Debtor occasionally loaned money to Leasco Aviation to pay expenses for

19  pilots, crew, fuel, hangers, and other fees.  *Williams Trial Declaration*, ECF 1348, ¶ 42.

20  Debtor engaged in all aspects of management of Leasco Aviation and in most areas of

21  operations.  *Williams Trial Declaration*, ECF 1348, ¶ 43.

22    50. Debtor served as both pilot and navigator on many of the Leasco Aviation

23  flights since the inception of Leasco Aviation.  *Williams Trial Declaration*, ECF 1348, ¶ 43.

24    51. Sometime in 2002, Leasco Aviation acquired a Hawker airplane.  *Joint Pre-*

25  *Trial Stipulation*, ECF 1329 at 7, ¶ 45; *Williams Trial Declaration*, ECF 1348, ¶ 45.

26    52. Sometime in 2006, Leasco Aviation acquired a Gulfstream airplane.  *Joint*

27  *Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 46; *Williams Trial Declaration*, ECF 1348, ¶ 47.

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

53.    In 2008, Leasco Aviation still owned both the Hawker and Gulfstream airplanes. *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 47.

54.    During the years, Leasco Aviation 405DW's tax returns for tax years 2003 through 2008 reflected income and losses for aircraft activities, oil, gas, and mineral activities, as well as interest income. *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 48; *see Leasco Aviation 405DW Income Tax Returns, 2003-2008*, Joint Exhibits 124-129.

55.    Leasco Aviation 405DW's Form 1065 - U.S. Return of Partnership Income reported airplane rental income in the amount of $138,916 in 2006 and $294,026 with respect to the Hawker and $89,450 in 2007 and $57,500 in 2008 with respect to the Gulfstream. *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 49; *Leasco Aviation 405DW Income Tax Returns, 2007-2008*, Joint Exhibits 128-129.

56.    In Debtor's Declaration filed in support of the Claim Objection, Debtor stated, "In 2008, I owned an interest, directly or indirectly, in the following entities that were the management and administrative entities: Leasco Real Estate Investments, LLC; Leasco Realty Company, Inc.; Leasco Management Company, Ltd.; and SCHFC Management, Inc." *Declaration of Debtor in Support of Claim Objection*, ¶ 9, Joint Exhibit 50 and ECF 697; *see also Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 45:15-47:16.

57.    Debtor testified that he has always been directly responsible for and involved in negotiating and procuring long-term leases for properties held out for rent by the Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 40. Debtor testified that in all years since the inception of Leasco Management, he has spent a substantial amount of time with on-site property managers to establish leasing criteria particularly for the mini-storage and mobile home park properties. *Williams Trial Declaration*, ECF 1348, ¶ 40.

58.    Debtor testified that he routinely traveled to the properties owned by the Real Estate Entities in the various states to personally supervise the operation and management of these properties and that it was not uncommon for him to visit multiple

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

properties on each business trip while traveling outside of Southern California. *Williams Trial Declaration*, ECF 1348, ¶ 41.

59.     Debtor testified that many of the properties owned by the Real Estate Entities were difficult to reach and not serviced by many of the commercial airlines. *Williams Trial Declaration*, ECF 1348, ¶ 44.  According to Debtor, because of the significant number of Real Estate Entities, an aircraft was instrumental in his view to being able to minimize the downtime associated with lay-overs, boarding times, and other delays that are common with commercial flights, in order to be able to properly devote enough time to the effective operation and management of the properties and Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 44.  Because of this, he testified that in his opinion, the aircrafts were extremely helpful in managing the Real Estate Entities. *Williams Trial Declaration*, ECF 1348, ¶ 44; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 18-19.  Debtor testified that he "very seldom" travels commercially. *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 17.  Debtor also testified that flight logs confirm the days and locations of business-related trips. *Williams Trial Declaration*, ECF 1348, ¶ 71.

60.     Debtor testified at trial that, in or about 2006, he determined that a Gulfstream airplane would better satisfy the transportation needs relative to the Real Estate Entities and the Management Entities. *Williams Trial Declaration*, ECF 1348, ¶ 46.

61.     According to Debtor, he intended to sell the Hawker soon after the acquisition of the Gulfstream. *Williams Trial Declaration*, ECF 1348, ¶ 46.

62.     Debtor testified that the Hawker was not rented out for more than seven days, except with respect to its rental to Lockheed, which was for loss mitigation purposes only. *Williams Trial Declaration*, ECF 1348, ¶ 47.[2]  According to Debtor, the arrangement

---

[2] Subject to certain exceptions (including for QREPs), "rental activity" is automatically passive. 26 U.S.C. § 469(c)(2). "The term 'rental activity' means any activity where payments are principally for the use of tangible property." 26 U.S.C. § 469(j)(8). If property is rented for an average period of customer use of seven days or less throughout the year, rental of such property is not deemed "rental activity." 26 C.F.R. § 1.469-1T.

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  with Lockheed gave Lockheed first priority of use, but Leasco retained the ability use the

2  plane when Lockheed did not. *Williams Trial Declaration*, ECF 1348, ¶ 48.

3       63.     According to Debtor, Leasco Aviation received no payments of any kind in

4  2008 from any person or entity relating to the use of the Hawker in 2008. *Williams Trial*

5  *Declaration*, ECF 1348, ¶ 48.  But for certain reimbursement of expenses as identified

6  below, Leasco Aviation never received payment for the use of the Gulfstream by any

7  person or entity in any other year including 2008. *Williams Trial Declaration*, ECF 1348,

8  ¶ 48.  According to Debtor, the Gulfstream aircraft was not certified to be rented out for

9  profit, so he did not hold it out for rent, and it was only rented out to people he knew who

10 would cover the costs to operate the airplane. *Williams Trial Declaration*, ECF 1348, ¶ 49.

11 However, the court finds that it is irrelevant whether or not Debtor knew the people to

12 whom he rented the airplane, and the issue still remains whether rental of the aircraft

13 constituted "rental activity," which is automatically passive pursuant to 26 U.S.C.

14 § 469(c)(2).

15      64.     The IRS asserts that Debtor acquired the Hawker airplane using Leasco

16 Aviation, Inc., and not Leasco Aviation 405DW, which is a different entity, and that Leasco

17 Aviation, Inc. was the company previously established by Debtor that had losses that did

18 not flow through to Debtor since it was not a pass-through entity. *See USA's Proposed*

19 *Findings and Conclusions*, ECF 1359 at 25, ¶ 91 (citing *Leasco Aviation 405DW Year End*

20 *Work Papers*, Joint Exhibit 118; *Leasco Aviation 405DW Financial Statements for Tax*

21 *Years 2002-2008*, Joint Exhibit 119; and *McLevich Testimony, Trial Transcript, June 1,*

22 *2017*, ECF 1355 at 46-47).  However, this assertion contradicts the facts to which the IRS

23 stipulated before trial as set forth in the Joint Pre-Trial Stipulation. *See Joint Pre-Trial*

24 *Stipulation*, ECF 1329 at 7, ¶¶ 44-49.  Moreover, the evidence at trial does not support the

25 IRS's assertion.  Joint Exhibits 118 and 119 consist of hundreds of pages of internal

26 accounting records for Leasco Aviation 405DW, and the IRS failed to identify what portion

27 of those exhibits supports its assertion.  Also, the testimony of McLevich is insufficient to

28

-17-

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1 | prove which entity purchased the airplane because he lacks personal knowledge of the

2 | purchase transaction.

3 |      65.    According to Leasco Aviation 405DW's tax returns, its business activity was

4 | reported as "aircraft rental" and its product or service was reported as "air transportation."

5 | *Leasco Aviation 405DW Income Tax Returns, 2002-2008*, Joint Exhibits 123-129; *see*

6 | *also McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 63:13-65:1.  The

7 | IRS Form K-1s issued by Leasco Aviation 405DW did not include any rental real estate

8 | activities.  *Id.; see also 2008 Reconciliation for Real Estate Professions*, Joint Exhibit 23;

9 | *Partner's Adjusted Basis Worksheets for 2008*, Joint Exhibit 24.  While Debtor testified

10 | that he did not believe the airplanes were certified to be rented out, such lack of

11 | certification is beside the point since Debtor has admitted that he rented out the aircraft,

12 | Leasco Aviation had reported rental income on its tax returns and Leasco Aviation listed

13 | its business as aircraft rental on its tax returns.  *Compare Williams Trial Declaration*, ECF

14 | 1348, ¶¶ 48-49, *with Leasco Aviation 405DW Income Tax Returns, 2002-2008*, Joint

15 | Exhibits 123-129.

16 |      66.    Debtor testified that Leasco Aviation 405DW rented its aircraft and that

17 | during 2006 and 2007 Lockheed Martin contracted for the opportunity to use the plane for

18 | a several-month period, which exceeded seven days.  *See Williams Trial Declaration*,

19 | ECF 1348, ¶ 48.

20 |      67.    Debtor's tax returns do not reflect that his Leasco Aviation expenses were

21 | management expenses, as with other entities that included "management" in the title or

22 | entities that Debtor previously identifies as management entities.  *See Debtor's Form*

23 | *1040 2006 Income Tax Return*, Joint Exhibit 1; *Debtor's Form 1040 2006 Income Tax*

24 | *Return*, Joint Exhibit 2; *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16;

25 | *Debtor's Form 1040 Schedule E for 2006*, Joint Exhibit 17; *Debtor's 2002 Income Tax*

26 | *Return*, Joint Exhibit 108; *Debtor's 2003 Income Tax Return*, Joint Exhibit 109; *Debtor's*

27 | *2004 Income Tax Return*, Joint Exhibit 110; *Debtor's 2005 Income Tax Return*, Joint

28 | Exhibit 111; *Debtor's Form 1040 Schedule E for 2002-2005 & 2007*, Joint Exhibit 113;

-18-

1  *Debtor's 2007 Income Tax Return*, Joint Exhibit 106; *see also Brenning Testimony, Trial*

2  *Transcript, June 1, 2017*, ECF 1355 at 154:11-157:1 (conflicting testimony as to whether

3  Leasco Aviation was included in Debtor's management activities).  As with Debtor's tax

4  returns for tax years 2003 through 2007, Debtor's list of QREP activities on his 2008 tax

5  return did not include any losses related to Leasco Aviation (including its airplane

6  expenses and depreciation) or any of its oil, mineral and gas activities, but did

7  inappropriately include losses from Fayetteville Shale and RS Minerals.  *See id.; see also*

8  *Leasco Aviation 405DW Income Tax Returns, 2002-2008*, Joint Exhibits 123-129.

9       68.    When asked about Leasco Aviation, Lori Brenning stated in her testimony

10  that its only "management" function was flying Debtor, that Leasco Aviation did not have

11  any employees, that it was in the oil and gas business, and that it did not own any rental

12  real estate properties. *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at

13  247-250.

14       69.    When Debtor was asked about the remoteness of the Rental Real Estate

15  Properties requiring use of a private aircraft rather than a commercial flight, Debtor

16  acknowledged that the Rental Real Estate Properties in Houston, Texas, Orlando, Florida,

17  Phoenix, Arizona, Memphis, Tennessee, Las Vegas, Nevada, and Orange County,

18  California, were not remote. *Williams Testimony, Trial Transcript, June 2, 2017*, ECF

19  1354 at 19-21.  Debtor was not able to recall at trial an example of one of the Rental Real

20  Estate Properties which was remote. *Id*. at 19.

21       70.    In 2008, Debtor took non-business-related flights on Leasco Aviation's

22  aircraft that included trips to Hawaii, Mexico, the Bahamas, and an island off Florida,

23  where Debtor did not own any rental properties. *Leasco Aviation Flight Log Analysis*,

24  Joint Exhibit 115; *Leasco Aviation Flight Logs*, Joint Exhibit 116; *Leasco Aviation*

25  *Miscellaneous Documents dated 2002-2008*, Joint Exhibit 117; *Brenning Testimony, Trial*

26  *Transcript, June 1, 2017*, ECF 1355 at 197:1-205:17 (admitting that there were no rental

27  real estate activities in (1) the Bahamas; (2) Lanai City, Hawaii; (3) Kailua-Kona, Hawaii;

28  (4) Deming, New Mexico; (5) Thermal, California; (6) Englewood, Aspen, and Denver

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

Colorado; (7) Reno, Nevada, (8) El Paso, Texas; (9) Puerto Vallarta, Mexico; or (10) Baja, Mexico).  Debtor's accountant assumed the trips were business, and Debtor did not provide him with evidence substantiating the deductions or discuss the nature of these deductions.[3]  *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 60:21-63:9.

71.    In prior years, 2002 through 2007, Debtor took non-business flights on Leasco Aviation's aircraft that were personal in nature and those trips were included in the losses Debtor deducted for Leasco Aviation.  *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 60:21-63:9*; see also Drysdale Trial Declaration*, ECF 1337, ¶¶ 69-71; *Leasco Aviation Flight Log Analysis*, Joint Exhibit 115; *Leasco Aviation Flight Logs*, Joint Exhibit 116; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 42:13-44:6 (admitting that he did not own rental real estate property in places where the airplane traveled including Hawaii, the Bahamas, Colorado and Mexico).  Debtor also admitted that he used a Cadillac Escalade owned by Leasco Aviation for his personal use.  *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 42:13-19.

72.    Brenning stated in her testimony that Debtor had used the Leasco Aviation airplanes for his personal use between 2002 and 2008, that he had no restrictions for such use, and that she was not aware of any payments made by him to Leasco Aviation 405DW for the personal use of the airplanes.  *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 217-220.

73.    Leasco Aviation has no lease agreements or other management agreements regarding the use of the airplanes by Debtor's QREP entities.  *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 32-33; *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 221; *see also Debtor's May & June 2014 Responses to Interrogatories*, Joint Exhibit 130; *Debtor's May & June 2014 Responses to*

---

[3] For one of the trips to Hawaii, Debtor and Brenning submitted trial declarations that Leasco Aviation received a $50,000 reimbursement payment from Debtor.  Both Debtor and Brenning amended their declarations to remove that statement and now contend that some other individual made the payment.  *See Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 229:1-230:8 (referencing paragraph 11 in her original trial declaration).

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

*Requests for Admission*, Joint Exhibit 131; *Debtor's May & June 2014 Responses to Requests for Production of Documents*, Joint Exhibit 132; *Debtor's June 16, 2014 Supplemental Responses to Requests for Production of Documents*, Joint Exhibit 133 (Debtor did not include Leasco Aviation in his representations in the litigation pertaining to what was included in his QREP grouping and the QREP management activities).

74.     Leasco Aviation did not have any cost-sharing agreements between Leasco Aviation and any other rental real estate entity in 2008, and Debtor has not produced any evidence of such agreements for any other tax years.  *Brenning Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 221:4-19.

75.     According to the IRS, Debtor took trips that cost between $10,000 and $25,000 a flight, which was likely more expensive than flying on a commercial airline carrier.  *See Drysdale Trial Declaration*, ECF 1337, ¶ 71.[4]

76.     Debtor's accountant, McLevich, admitted in his testimony that he did not receive flight logs or passenger logs from Debtor and did not verify whether all of the expenses listed on Leasco Aviation 405DW's tax returns were legitimate deductions.  *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 60:21-63:9.

### ii.   Fayetteville Shale and RS Minerals

77.     Debtor acquired an undivided 82.5% membership interest in Fayetteville Shale Gas I, LLC ("Fayetteville"), which invested in shale oil leases.  *Williams Trial Declaration*, ECF 1348, ¶ 72; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 22:6-11.

78.     Fayetteville was formed in 2006 but it never made a profit.  *Williams Trial Declaration*, ECF 1348, ¶ 72.

---

[4] Revenue Agent Drysdale provided no foundation of personal knowledge or other basis for this opinion testimony.  There was no showing that he is qualified as an expert witness regarding commercial airline prices for purposes of Federal Rule of Evidence 702, and such technical opinion testimony by a lay witness is not admissible under Federal Rule of Evidence 701(c).  However, as discussed by the court in its legal rulings, the United States properly raises the issue of whether Debtor's claimed aviation expense losses are deductible ordinary and necessary trade or business expenses under 26 U.S.C. § 162, and Debtor has the burden of proving the allowability of such expense deductions under 26 U.S.C. § 162.  *See, e.g., Commissioner v. Lincoln Savings and Loan Association*, 403 U.S. 345, 352-353 (1971).

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

79.    Debtor testified that Fayetteville's shale oil leases were short term and had not produced and were unlikely to produce, and therefore, the entity was terminated because its leases were worthless and/or terminated by December 31, 2008.  Williams Trial Declaration, ECF 1348, ¶72.

80.    This testimony is credible because it is supported by other documentation, such as Fayetteville's final tax return and workpapers for 2008.  The IRS Form 1065-Partnership Income Tax Return, filed by Fayetteville, is marked as a "final return," and the IRS Form K-1 issued to Debtor reported a loss passed through to him in the amount of $1,266,875.00.  Joint Exhibit 161 at 1-2.  The books and records of Fayetteville reflect an abandonment loss in the amount of $1,401,376.48.  Joint Exhibit 163.

81.    The court finds that Debtor's testimony and supporting evidence of the entity's worthlessness and termination in 2008 is credible and that it substantiates the worthless interest loss by a preponderance of the evidence for purposes of 26 U.S.C. §165.

82.    In or about 2006, Debtor formed RS Minerals, LLC ("RS Minerals"), to acquire stock in U.S. Bentonite, Inc.  *Williams Trial Declaration*, ECF 1348, ¶ 73.

83.    Fayetteville and RS Minerals were entities engaged in oil, gas and mineral activities.  *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34; *Williams Trial Declaration*, ¶¶ 72-73; *Fayetteville – 2008 U.S. Return of Partnership Income*, Joint Exhibit 161; *Fayetteville Shale Gas 1, LLC – Valley Petro Consulting, Inc. Year End Work Papers*, Joint Exhibit 162; *Fayetteville Shale – Year End Work Papers*, Joint Exhibit 163.

84.    As discussed below, the court finds that the inclusion of Fayetteville and RS Minerals in the grouping was merely an accountant's or scrivener's error and was not material because it did not affect Debtor's tax liability.  Such inclusion was not an admission of inconsistency that would preclude Debtor from making a late QREP Election.

### iii.    **Blue Heron**

85.    Debtor reported a loss on his IRS Form 4797 - Sales of Business Property for tax year 2008 in the amount of $4,575,254.00 based on the disposition of real estate

located at 44 Blue Heron, Irvine, California ("Blue Heron Property").  *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 50; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2; *Blue Heron Documents*, Joint Exhibit 164.  Schedule E, Line 43 on Debtor's income tax return for tax year 2008 included the loss reported on the Form 4797 as well as expenses in the amount of $262,101.00.  *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 50; *see also Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16.

86.    Debtor testified that he intended to rent out the Blue Heron Property and advertised the Property for rent for several months, but he was unable to find any tenants because of the real estate crash.  *Williams Trial Declaration*, ECF 1348, ¶ 74.  Debtor agreed on cross-examination that he did not rent the Blue Heron property.  *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 19:25-20:6.  Debtor eventually listed the Blue Heron Property for sale, and it sold for a loss on or about April 8, 2008.  *Williams Trial Declaration*, ECF 1348, ¶ 74.

87.    Accordingly, in the Joint Pre-Trial Stipulation, the parties stipulated that the claimed loss of $4,575,254.00 from Debtor's IRS Form 4797 for 2008 should be excluded from the loss inducible on Schedule E, Line 43, on his tax return for 2008 and should be reported as follows: (i) a Short-Term Capital Loss in the amount of $4,668,242.00, and (ii) real estate taxes reportable on Schedule A subject to any additional limitations on itemized deductions.  *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 51; *see also USA's Proposed Findings and Conclusions*, ECF 1359 at 28, ¶ 111 n.7 ("While the Debtor's 2008 NOL is reduced, the Debtor is entitled to a short-term capital loss of $4,668,242.00 (the claimed loss of $4,575,254.00 from Form 4797 plus the $92,988.00 of depreciation), which is carried forward in the form of a short-term capital loss carryforward.").

**D.    Debtor's Income Tax Returns**

88.    Debtor filed federal income tax returns (IRS Forms 1040) for tax years 1995 through 2008 with the IRS.  *See Debtor's Form 1040 2006 Income Tax Return*, Joint Exhibit 1; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2; *Debtor's 1995 Income Tax Return*, Joint Exhibit 103; *Debtor's 2007 Income Tax Return*, Joint Exhibit

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

106; *Debtor's 2002 Income Tax Return*, Joint Exhibit 108; *Debtor's 2003 Income Tax Return*, Joint Exhibit 109; *Debtor's 2004 Income Tax Return*, Joint Exhibit 110; *Debtor's 2005 Income Tax Return*, Joint Exhibit 111; *see also Debtor's 2010 Form 1040X (Request for Relief under Rev. Proc. 2011-24)*, Joint Exhibit 100 (statement included in 2010 1040X indicating that Debtor had filed returns since 1994); *Drysdale Trial Declaration*, ECF 1337, ¶ 6.  Next to Debtor's signature, he listed his occupation as "Investor."  *See id*.

89.    For tax year 2008, the reported losses of the Rental Real Estate Entities on Debtor's income tax returns (IRS Forms 1040) are summarized in the chart attached as Exhibit 2 to the *Joint Pre-Trial Stipulation*.  *Exhibit 2 to Joint Pre-Trial Stipulation*, ECF 1329 at 35-37; *see also id.* at 6, ¶ 35.

90.    Most of the Rental Real Estate Entities filed their own separate income tax returns.  *Joint Pre-Trial Stipulation*, ECF 1329 at 6, ¶ 36.  If applicable for the particular entity, the pass-through income or losses from the Rental Real Estate Entities were reported on an IRS Form K-1 that was issued to Debtor and reported by the Debtor on his income tax return (Form 1040) for a particular tax year.  *Joint Pre-Trial Stipulation*, ECF 1329 at 6, ¶ 36; *see Declaration of Lawrence McLevich*, filed on April 27, 2017, ECF 1335, as amended by *Revised Declaration of Lawrence McLevich ("McLevich Trial Declaration")*, filed on May 30, 2017, ECF 1347 at 5, ¶ 35.

### i.    Debtor's 2006 and 2007 Income Tax Returns

91.    On or about October 15, 2007, Debtor filed an IRS Form 1040 – U.S. Individual Income Tax Return ("Form 1040") for the tax year 2006 reporting adjusted gross income net of net operating loss carryforwards or carrybacks of  (i) $31,741,090 ("2006 Adjusted AGI") and (ii) a tax liability of $4,007,836.00 and various credits and payments in the aggregate amount of $4,500,760.00.  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 1; *Drysdale Trial Declaration*, ECF 1337, ¶ 9; *see Debtor's Form 1040 2006 Income Tax Return*, Joint Exhibit 1.

92.    Debtor's 2006 Form 1040 reported net operating loss ("NOL") carryforwards that resulted from losses originally reported on Debtor's Form 1040 U.S. Individual Income

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

Tax Returns for tax years 2002 through 2005 ("2002 to 2005 NOL CFs").  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 2; *see Debtor's Form 1040 2006 Income Tax Return*, Joint Exhibit 1; *Tax Return NOL Carryover Worksheets for Tax Years 2003-2009*, Joint Exhibit 7.

93.    On or about November 12, 2007, the IRS issued Debtor a refund in the amount of $492,924.00 for the overpayment of reported on his 2006 Form 1040 ("2006 Overpayment").  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 3; *see Treasury Check for 2006 Refund*, Joint Exhibit 4; *2006 Form 4340, Certificate of Assessments and Payments*, Joint Exhibit 9.

94.    On or about October 15, 2008, Debtor filed his 2007 Form 1040 reporting a NOL in the amount of $9,819,762 ("2007 NOL") based upon losses that Debtor contends were losses that resulted from nonpassive activities from pass through entities.  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 4; *see Debtor's 2007 Income Tax Return*, Joint Exhibit 106.

95.    On or about October 19, 2008, Debtor filed an IRS Form 1045 – Application for Tentative Refund ("Form 1045") applying NOL carryback from the tax year 2007 to Debtor's income tax liability for 2006 tax year and reporting a decrease in tax in the amount of $1,129,975 for the 2006 tax year ("2007/2006 Tentative Refund").  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 5; *2007 Form 1045 – Application for Tentative Refund*, Joint Exhibit 107.

96.    On or about November 14, 2008, the IRS issued a check to Debtor representing a tentative refund in the amount of $1,129,975 from applying a NOL carryback from tax year 2007 to Debtor's income tax liability for tax year 2006, and Debtor cashed this check.  *Joint Pre-Trial Stipulation*, ECF 1329 at 2, ¶ 6; *see Treasury Check for 2006 Refund*, Joint Exhibit 4; *2006 Form 4340, Certificate of Assessments and Payments*, Joint Exhibit 9.

97.    The IRS has not asserted a claim with respect to the overpayments of tax refunded to Debtor based on items shown on his income tax returns for tax years 2006 or

1  2007.  *See, e.g.*, IRS Proofs of Claim 11-1, 11-2, 11-3; *Drysdale Trial Declaration*, ECF
2  1337, ¶¶ 10 and 11.

3          **ii.**   **Debtor's 2008 Income Tax Return**

4       98.    On or about April 15, 2009, Debtor timely filed his 2008 Form 1040 with the
5  IRS, reporting no tax liability and an NOL in the amount of $21,839,445 ("2008 NOL")
6  based upon losses that Debtor claimed were losses that resulted from nonpassive
7  activities from pass through entities.  *Joint Pre-Trial Stipulation*, ECF 1329 at 2-3, ¶ 7;
8  *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2 (*see* Schedules D, E, and
9  Form 4767); *see also 2006 Form 4340, Certificate of Assessments and Payments*, Joint
10 Exhibit 9.

11      99.    Schedule E, Line 43, Reconciliation for real estate professions, of Debtor's
12 2008 Form 1040 reported losses in the amount of $20,221,927 ("Line 43 Amount").  *Joint*
13 *Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 8; *see Debtor's Form 1040 Schedule E for 2008*,
14 Joint Exhibit 16.  Line 43 provides, "If you were a real estate professional . . . enter the net
15 income or (loss) you reported anywhere on Form 1040 or Form 1040NR from all rental
16 real estate activities in which you materially participated under the passive activity loss
17 rules." *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16; *Drysdale Trial*
18 *Declaration*, ECF 1337, ¶ 7.

19      100.   The Line 43 Amount (i) included losses from RS Minerals and Fayetteville
20 Shale and (ii) did not include income or losses from Leasco Aviation 405DW, Inc., and
21 Leasco Realty Co., Inc.  *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 9; *Debtor's Form*
22 *1040 2008 Income Tax Return*, Joint Exhibit 2; *Debtor's Form 1040 Schedule E for 2008*,
23 Joint Exhibit 16.

24      101.   Previously, Debtor on Schedule E, Line 43 on his Forms 1040 for tax years
25 2002 through 2007: (i) did not include any income or losses from Leasco Aviation 405DW
26 and Leasco Realty Co., Inc.; and (ii) included income and losses from RS Minerals and
27 Fayetteville Shale.  *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 10.

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1     102.   With Debtor's 2008 Form 1040, he submitted an IRS Form W-2, Wage

2 Statement, indicating that he was an employee of Leasco Management. *Joint Pre-Trial*

3 *Stipulation*, ECF 1329 at 7, ¶ 43; *Debtor's Form 1040 2008 Income Tax Return*, Joint

4 Exhibit 2 (*see Debtor's W-2 from Leasco Management*).

5     103.   Prior to the filing of Debtor's bankruptcy case, the IRS initiated an audit

6 examination of his 2008 Form 1040. *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 13.  In

7 connection with this audit examination, the IRS examined whether Debtor was entitled to

8 claim losses of $20,221,927 (out of the total 2008 NOL of $21,839,445) that he claimed on

9 his Schedule E related to his 2008 QREP activities (from rental real estate, royalties,

10 partnerships, S corporations, estates, trusts, REMICs, etc.).  *Drysdale Trial Declaration*,

11 ECF 1337, ¶ 18.

12         **iii.   Worthless Loss**

13     104.   Debtor asserted a claim based upon worthless loss pursuant to 26 U.S.C.

14 § 165 in his First Amended and Restated Complaint for Declaratory Relief and

15 Disallowance of Claim, filed on April 25, 2014.  *See Complaint*, ECF 926 at 22:22-25:6;

16 *Joint Pre-Trial Stipulation*, ECF 1329 at 8, ¶ 54.

17     105.   Debtor asserts that as of December 31, 2009, he had a tax basis of: (1) not

18 less than $6,136,132 in Canon Pan Am Investors, LLC, a Nevada limited liability company

19 ("Canon Pan Am"); (2) not less than $29,160,048 in Crownridge Management, LLC, a

20 California limited liability company ("Crownridge Management"); (3) not less than

21 $5,403,698 in Eastpoint Business Center, LLC, a Nevada limited liability company

22 ("Eastpoint Business Center"); (4) not less than $16,947,408 in Kirkman Kennedy

23 Edgewater Management, LLC, a Nevada limited liability company ("KKEM"); (5) not less

24 than $2,945,972 in Lake Osbourne Self Storage, LLC, a Nevada limited liability company

25 ("Lake Osbourne"); (6) not less than $4,849,849 in Maxey Storage, L.P., a Nevada limited

26 partnership ("Maxey Storage"); (7) not less than $1,602,668 in New Orleans One Storage,

27 LLC, a Nevada limited liability company ("New Orleans One"); (8) not less than

28 $56,944,373 in South Coast Home Furnishing Center, LLC, a Nevada limited liability

company ("South Coast"); (9) not less than $7,775,099 in Stone Creek Retail Center, LTD, a Nevada limited partnership ("Stone Creek Retail"); (10) not less than $12,743,398 in Winter Garden Business Park, LLC, a Nevada limited liability company ("Winter Garden Business Park"); and (11) not less than $1,163,143 in Winter Garden Self Storage, LLC, a Nevada limited liability company ("Winter Garden Self Storage").  *See Complaint*, ECF 926 at 23-24, ¶¶ 159-169.

106.    Debtor further asserts that (1) his interests in Canon Pan Am, Crownridge Management, Eastpoint Business Center, KKEM, Lake Osbourne, Maxey Storage, New Orleans One, South Coast, Stone Creek Retail, Winter Garden Business Park, and Winter Garden Self Storage ("Worthless Entities") were worthless on or before December 31, 2008, *see Complaint*, ECF 926 at 23-24, ¶¶ 159-169; (2) he has sustained a worthless loss of not less than $145,671,788 as of December 31, 2008 relating to and on account of the Worthless Entities, *see Complaint*, ECF 926 at 24, ¶ 171; and (3) his 2008 worthless loss relating to and on account of the Worthless Entities exceeds the amount of the Rental Real Estate Loss, *see Complaint*, ECF 926 at 24, ¶ 172.

107.    In Debtor's 2008 Form 1040, Debtor did not report, or indicate an intent to report, any of the Rental Real Estate Entities as worthless or abandoned on his 2008 Form 1040.  *Joint Pre-Trial Stipulation*, ECF 1329 at 8, ¶ 52; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2; *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 103:14-19, 104:3-6 (would have included a statement that the interest was abandoned or that the interest was now worthless).

108.    Debtor's 2008 Form 1040 used an asterisk to identify an "entire disposition of nonpassive activity."  *Joint Pre-Trial Stipulation*, ECF 1329 at 8, ¶ 53; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2.

109.    On Debtor's 2008 Form 1040, he did not claim that he intended to treat any of his interests in the entities listed in his return as worthless.  *See Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2.

-28-

1    110.    Debtor argues that he should be allowed to present his case supporting a

2  "setoff" for worthless losses pursuant to 26 U.S.C. § 165(a).  *Debtor's Proposed Findings*

3  *of Fact and Conclusions of Law,* ECF 1360 at 72.  As stated in its legal rulings, the court

4  agrees because the parties may prove or disprove the IRS's deficiency determination for

5  the excess refund from the disallowed tentative carryback refund on any grounds pursuant

6  to 26 U.S.C. §6501(h) and (k).  Since Debtor has not offered evidence to substantiate

7  these worthless loss claims in Phase 1, he may do so in Phase 2.

8    **iv.    Debtor's 2008 Form 1045 – Application for Tentative Refund**

9    111.    On or about May 14, 2009, Debtor filed an IRS Form 1045, Application for

10  Tentative Refund, which carried back $14,404,844 of the 2008 NOL to his income tax

11  liability for tax years 2006 and reported a decrease in tax in the amount of $2,415,779 for

12  tax year 2006 ("2008/2006 Tentative Refund").  *Joint Pre-Trial Stipulation*, ECF 1329 at 3,

13  ¶ 11; *Debtor's 2008 Form 1045 – Application for Tentative Refund (with Amended 2006*

14  *Return)*, Joint Exhibit 3.  This claimed refund was separate from, and in addition to, the

15  amounts of overpaid tax of $492,924.00 and $1,129,975.00 that the IRS previously

16  refunded for tax year 2006 on November 12, 2007 and November 14, 2008.  *See 2006*

17  *Form 4340, Certificate of Assessments and Payments*, Joint Exhibit 9.

18    112.    Debtor's income tax liabilities for tax years 2006 and 2008 are affected by

19  losses that he has claimed for tax years 2002 through 2008, and that was the basis for

20  Debtor's tentative refund claim.  *See Debtor's Form 1040 2006 Income Tax Return*, Joint

21  Exhibit 1; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2; *Debtor's 1995*

22  *Income Tax Return*, Joint Exhibit 103; *Debtor's 2007 Income Tax Return*, Joint Exhibit

23  106; *Debtor's 2002 Income Tax Return*, Joint Exhibit 108; *Debtor's 2003 Income Tax*

24  *Return*, Joint Exhibit 109; *Debtor's 2004 Income Tax Return*, Joint Exhibit 110; *Debtor's*

25  *2005 Income Tax Return*, Joint Exhibit 111; *Joint Pre-Trial Stipulation*, ECF 1329, ¶¶ 1-2.

26    113.    The instructions for IRS Form 1045 provide under the heading "EXCESSIVE

27  ALLOWANCES" that "[a]ny amount applied, credited, or refunded based on this

28  application that the IRS later determines to be excessive may be billed as if it were due to

-29-

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

a math or clerical error on the return." *See 2008 Instructions for Form 1045*, Exhibit A to *Drysdale Trial Declaration*, ECF 1337.

114.    On or about June 10, 2009, the IRS issued to Debtor a check in the amount of $2,415,779 for the 2008/2006 Tentative Refund, and Debtor cashed this check. *Joint Pre-Trial Stipulation*, ECF 1329 at 3, ¶ 12; *see Treasury Check for 2006 Refund*, Joint Exhibit 4.

## E.    Original QREP Election

115.    Debtor has been unable to produce a copy of the Qualified Real Estate Professional Election required for purposes of 26 U.S.C § 469(c)(7)(B) ("QREP Election"), either with his 1994 Form 1040 or any other subsequent tax return. *Joint Pre-Trial Stipulation*, ECF 1329 at 6, ¶ 37.

116.    Debtor testified at trial that with respect to the required Qualified Real Estate Professional election, he has always relied upon his certified public accountants to ensure he was in compliance with any tax election requirements. *Williams Trial Declaration*, ECF 1348, ¶ 75.  Debtor's former accountant, Ron Clark, previously prepared Debtor's income tax returns for Debtor as an individual and for Debtor's businesses, and when Larry McLevich acquired Clark's accounting practice, Debtor engaged McLevich to prepare income tax returns for Debtor as an individual and for Debtor's businesses beginning in 2001. *Williams Trial Declaration*, ECF 1348, ¶ 77; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 7:22-8:1.  Debtor testified that he relied upon McLevich to properly prepare his income tax returns, to report income and expenses accurately, to make tax elections, and to file his tax returns on a timely basis. *Williams Trial Declaration*, ECF 1348, ¶ 78; *Williams Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 275:6-1.

117.    Debtor testified that he did not understand all the complex procedural tax requirements that appeared on his tax returns, so he relied upon his CPA to report his tax liabilities correctly and to make proper tax elections. *Williams Trial Declaration*, ECF 1348, ¶ 79; *Williams Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 276:13-25.  Debtor testified that his assistant, Brenning, helped him organize and provide his personal

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  and business accounting information, including the tax-related documents needed by

2  McLevich to prepare tax returns for Debtor and Debtor's businesses.  *Williams Trial*

3  *Declaration*, ECF 1348, ¶ 80; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF

4  1354 at 10:4-16.

5      118.   Debtor testified that he and Brenning always gave McLevich everything that

6  McLevich asked for to prepare tax returns for Debtor individually and for Debtor's

7  businesses.  *Williams Trial Declaration*, ECF 1348, ¶ 80.

8      119.   Debtor's current accountant, McLevich, did not file the QREP Election on

9  behalf of Debtor, and McLevich was "left with the impression" that Debtor's former

10 accountant, Clark, had done so prior to 2002.  *See McLevich Trial Declaration*, ECF 1347

11 at 3, ¶¶ 16, 23.  However, McLevich's "impression" is not based on personal knowledge

12 under Federal Rule of Evidence 602 to prove that Clark actually made the QREP election

13 on behalf of Debtor, and thus the court finds that Debtor has not shown by a

14 preponderance of the evidence that he made a timely QREP election through Clark.

15     120.   According to the IRS, during its audit examination, Debtor failed to provide

16 evidence that he made a timely QREP Election and could not otherwise substantiate the

17 losses.  *Drysdale Trial Declaration*, ECF 1337, ¶ 19.  According to Revenue Agent

18 Drysdale, the IRS could not confirm that Debtor had in fact properly elected to group his

19 Schedule E rental real estate activities to be treated as a single activity as required under

20 the Internal Revenue Code.  *Drysdale Trial Declaration*, ECF 1337, ¶ 19.  According to

21 Revenue Agent Drysdale, the IRS searched its electronic records and reviewed the tax

22 returns provided to him, and Debtor failed to substantiate that he made the proper election

23 or even tell Drysdale in what year that Debtor made the election.  *Drysdale Trial*

24 *Declaration*, ECF 1337, ¶ 19.  However, Debtor disputes that the IRS's search of its

25 records was full and exhaustive.  *See Debtor's Objections to USA's Proposed Findings*

26

27

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  *and Conclusions*, ECF 1363 at 6:6-12; *Government's Argument, Trial Transcript, June 2,*

2  *2017*, ECF 1354 at 120.[5]

3       121.   According to the IRS, without it establishing that Debtor made a timely

4  QREP election, or otherwise establishing that he materially participated as to each

5  individual entity or that he received relief under a private letter ruling and/or Rev. Proc.

6  2011-34, it decided not to expend additional resources in order to investigate the Debtor's

7  income tax liabilities any further and made the assessment of tax for the tax year 2006

8  based upon the evidence presented during the examination.  *Drysdale Trial Declaration*,

9  ECF 1337, ¶¶ 19-21.  As a result, after making these computational adjustments and

10  without sending out a statutory notice of deficiency, the IRS disallowed the 2008 NOL

11  carryback to the 2006 income tax liability and assessed Debtor for the tentative refund

12  that Debtor received, plus interest.  *2006 IRS Form 4340, Certificate of Assessments and*

13  *Payments*, Joint Exhibit 9; *Drysdale Trial Declaration*, ECF 1337, ¶¶ 19-21; *see also* IRS

14  POC No. 11-3.

15      **F.**    **Late QREP Election Pursuant to Rev. Proc. 2011-34**

16       122.   On or about May 16, 2014, Debtor filed his Form 1040X – Amended U.S.

17  Income Tax Return for the tax year 2010 ("2010 Form 1040X") for the purpose of making

18  a late QREP Election pursuant to Rev. Proc. 2011-34.  *Joint Pre-Trial Stipulation*, ECF

19  1329 at 6, ¶ 38; *Debtor's 2010 Form 1040X (Request for Relief under Rev. Proc. 2011-*

20  *24)*, Joint Exhibit 100.

21       123.   Debtor's 2010 Form 1040X stated that "[t]he [2010] return is amended to

22  attach the election to treat taxpayer's rental real estate activities as a single activity

23  pursuant to Rev. Proc. 2011-34."  *Joint Pre-Trial Stipulation*, ECF 1329 at 6, ¶ 39;

24  *Debtor's 2010 Form 1040X (Request for Relief under Rev. Proc. 2011-24)*, Joint Exhibit

25  100.  As early as June 8, 2012, Debtor's counsel notified the IRS that "the Taxpayer

26

27  [5] In Debtor's trial brief, he suggests that the United States has the burden to produce the election.  *Debtor's Trial Brief*, ECF 1345, ¶¶ 4-15.  The court rejects Debtor's argument and holds that it is Debtor's burden, not

28  the United States, to provide "credible evidence" that he made the election in the first instance.  Only then may the burden shift to the IRS under 26 U.S.C. § 7491.

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  [Debtor] intends to utilize the benefits of Rev. Proc. 2011-34." *June 8, 2012 Letter from*
2  *Minna C. Yang to Andrew Drysdale*, Joint Exhibit 165.

3      124.  On or about October 9, 2014, the IRS issued a letter to Debtor regarding his
4  request contained in his 2010 Form 1040X, stating to Debtor, "We have processed your
5  2010 Amended return and allowed your Rental Real Estate Activity Election as
6  requested." *October 9, 2014 from IRS to Debtor*, Joint Exhibit 101.

7      125.  Debtor timely filed each of the income tax returns for tax years 2002 through
8  2008 that would have been affected by the election filed with Debtor's 2010 Form 1040X.
9  *Joint Pre-Trial Stipulation*, ECF 1329 at 6, ¶ 41.

10      **G.  Grouping for Purposes of Rev. Proc. 2011-34**

11          **i.  Fayetteville/RS Minerals/Leasco Aviation Oil and Gas Election**

12      126.  On Debtor's Forms 1040 for tax years 2007 and 2008, he included in the
13  losses reported on Schedule E, Line 43, amounts attributable to Fayetteville Shale Gas 1
14  LLC and RS Minerals LLC.  *See Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit
15  16; *Debtor's Form 1040 Schedule E for 2002-2005 & 2007*, Joint Exhibit 113; *Joint Pre-*
16  *Trial Stipulation*, ECF 1329 at 3, ¶¶ 9-10; *McLevich Testimony, Trial Transcript*, ECF 1355
17  at 74-77, 81:10-81:22.  The IRS Form K-1s relating to these entities indicated that they
18  had no income or losses attributable to rental real estate to report.  *See 2008*
19  *Reconciliation for Real Estate Professions*, Joint Exhibit 23; *Partner's Adjusted Basis*
20  *Worksheets for 2008*, Joint Exhibit 24 (*see* Form K-1s and Partnership Adjustment Sheets
21  summarizing K-1s, NOLs and other attributes for the specific entities).

22      127.  On Debtor's Form 1040 for tax year 2006, he did not include his interests in
23  Fayetteville or RS Minerals in his list of QREP activities, but instead included them in his
24  list of non-QREP activities.  *Debtor's Form 1040 2006 Income Tax Return*, Joint Exhibit 1;
25  *Debtor's Form 1040 Schedule E for 2006*, Joint Exhibit 17; *McLevich Testimony, Trial*
26  *Transcript, June 1, 2017*, ECF 1355 at 77:11-79:12.

27      128.  Debtor's accountant, McLevich, acknowledged in his testimony at trial that
28  his statement in paragraph 43 of his trial declaration "may not be totally consistent" after

recognizing that the 2007 and 2008 returns incorrectly included Fayetteville Shale and RS Minerals. *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355 at 77:4; *see also id.* at 74-77, 121:21-122:2 (stating that the inclusion of those two entities "must have been some type of mistake, improperly posted or recorded").  The court finds that the inclusion of RS Minerals and Fayetteville in the grouping was merely an accountant's or scrivener's error and was not material because it did not affect Debtor's tax liability.  The court finds that such inclusion was not an admission of inconsistency that would preclude Debtor from making a late QREP Election.

### ii.    Leasco Aviation 405DW

129.    According to the IRS, on Debtor's Forms 1040 for tax years 2003 through 2008, he did not report any airplane related expenses on his list of real estate professional expenses but did include some travel expenses.  *Drysdale Trial Declaration*, ECF 1337, ¶ 38 (summarizing Debtor's tax returns on this point).

130.    As detailed in Debtor's income tax returns (Forms 1040) for tax years 2002 through 2008, Debtor did not classify his Leasco Aviation expenses/losses as management expenses.  *Drysdale Trial Declaration*, ECF 1337, ¶ 39; *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16; *Debtor's Form 1040 Schedule E for 2006*, Joint Exhibit 17; *Debtor's Form 1040 Schedule E for 2002-2005 & 2007*, Joint Exhibit 113. Debtor's 2008 list of QREP activities did not include any losses related to Leasco Aviation (including its airplane expenses and depreciation) or any oil, mineral and gas activities. *Id.*

131.    Leasco Aviation 405DW's income tax returns for tax years 2002 through 2008 reflected income and losses for aircraft activities, oil, gas and mineral activities, and interest income.  *See Leasco Aviation 405DW Income Tax Returns, 2002-2008*, Joint Exhibits 123-129.  Furthermore, Leasco Aviation's workpapers include the purchase of a Cadillac Escalade for more than $60,000, and there is no indication that this car was used for any purpose other than Debtor's personal use.  *See Leasco Aviation Miscellaneous Documents dated 2002-2008*, Joint Exhibit 117; *Leasco Aviation 405DW Year End Work*

1  *Papers*, Joint Exhibit 118; *Leasco Aviation 405DW Financial Statements for Tax Years*

2  *2002-2008*, Joint Exhibit 119.

3      132.    Debtor included separate statements for Leasco Aviation entitled "2003

4  Income from Passthroughs" that state the income and losses are "TRADE OR BUSINESS

5  – MATERIAL PARTICIPATION" and does not refer to "MATERIAL PARTICIPATING

6  REAL ESTATE PROFESSIONAL" (the reference Debtor used for his QREP activities).

7  *See, e.g.*, *Leasco Aviation Miscellaneous Documents dated 2002-2008*, Joint Exhibit 117

8  (copy of a Leasco Aviation materials from 2003 through 2008, including statements, Form

9  K-1s, balance sheets and information pertaining to income, expenses, assets and

10  liabilities); *see also Debtor's Form 1040 2006 Income Tax Return*, Joint Exhibit 1; *Debtor's*

11  *Form 1040 2006 Income Tax Return*, Joint Exhibit 2; *Debtor's 2007 Income Tax Return*,

12  Joint Exhibit 106; *Debtor's 2002 Income Tax Return*, Joint Exhibit 108; *Debtor's 2003*

13  *Income Tax Return*, Joint Exhibit 109; *Debtor's 2004 Income Tax Return*, Joint Exhibit

14  110; *Debtor's 2005 Income Tax Return*, Joint Exhibit 111.

15          **iii.    Leasco Real Estate Investments, LLC**

16      133.    Debtor owns a 3.5 percent interest in Leasco Real Estate Investments, LLC

17  and owns another interest indirectly through Leasco Aviation, an entity that is unaffiliated

18  with Leasco Aviation 405DW.  *Exhibit 1 to Joint Pre-Trial Stipulation*, ECF 1329 at 31-34;

19  *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16; *Debtor's Form 1040 Schedule*

20  *E for 2006*, Joint Exhibit 17.  Leasco Aviation is not a pass-through entity, and Debtor is a

21  shareholder of this entity.  *McLevich Testimony, Trial Transcript, June 1, 2017*, ECF 1355

22  at 46:18-47:18.

23      134.    According to the Form K-1s filed by Leasco Real Estate Investments LLC,

24  Leasco Real Estate Investments did not report any income or losses from rental real

25  estate on Box 2 of the K-1s.  *2008 Reconciliation for Real Estate Professions*, Joint

26  Exhibit 23 (*see* K-1s); *Partner's Adjusted Basis Worksheets for 2008*, Joint Exhibit 24.

27

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

### iv.    Leasco Management Company, Ltd.

135.    With Debtor's 2008 Form 1040 filed with the IRS, he submitted a Form W-2, Wage Statement, indicating that he was an employee of Leasco Management.  *Joint Pre-Trial Stipulation*, ECF 1329 at 7, ¶ 43; *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2 (*Debtor's W-2 from Leasco Management*).

136.    Debtor did not prepare on a daily basis a detailed timesheet tracking his daily activities, but he testified that he maintained business records that establish that he worked full-time in the real estate business as president of Leasco Management.  *Williams Trial Declaration*, ECF 1348, ¶¶ 70-71.  He testified that he was present in Leasco Management's Southern California office on most business days.  *See id*.

137.    As discussed above, Debtor's testimony about his work hours for Leasco management in Phase 1 was rather conclusory and not sufficiently corroborated by other witness testimony and other documentary evidence, and Debtor has the opportunity to provide further evidence to substantiate his work hour claims in Phase 2.

### v.    Inconsistent Treatment of Entities from 1995-1999

138.    The United States argues that Debtor is not eligible for relief under Rev. Proc. 2011-34 because he treated his interests inconsistently on his tax returns, but this argument is disputed by Debtor.  *United States's Proposed Findings of Fact and Conclusions of Law,* ECF 1359 at 30 (document page number 28), Proposed Finding of Fact, ¶108; *Debtor's Objections to United States's Proposed Findings of Fact and Conclusions of Law,* ECF 1363 at 13.  In the court's view, the United States has not shown how Debtor treated his interests inconsistent on his returns prior to tax year 2008, and it will have to make a more specific showing of alleged inconsistencies in Phase 2, particularly since the grouping for purposes of Rev. Proc. 2011-34 is by activity rather than by entity.

### H.    Contemporaneous Records

139.    Debtor testified that his calendars and other business records identify a number of additional complex real estate issues that he had direct involvement in during

-36-

tax year 2008 and other relevant tax years.  *Williams Trial Declaration*, ECF 1348, ¶ 69.
Debtor further testified that he maintained various business records that establish that he
worked on a full-time basis in the real estate business as President of Leasco
Management.  *Williams Trial Declaration*, ECF 1348, ¶ 70.

140.    Even though Leasco Management maintained an electronic calendaring
system, its calendar system did not reflect Debtor's activities on a given day.  *Williams
Trial Declaration*, ECF 1348, ¶ 71.  However, Debtor testified that Leasco's electronic
calendar identifies scheduled events that he participated in, such as conference calls and
meetings pertaining to a number of real estate issues related to the Real Estate Entities
on a daily basis.  *Williams Trial Declaration*, ECF 1348, ¶ 71.

141.    Debtor did not keep complete detailed records of the time he spent working
at Leasco Management or the nature of his work performed on a given day.  *Williams Trial
Declaration*, ECF 1348, ¶¶ 69-70; *Williams Testimony, Trial Transcript, June 2, 2017*, ECF
1354 at 16:3-12, 49:4-13; *see also Brenning Testimony, Trial Transcript, June 1, 2017*,
ECF 1355 at 162-165, 172-181, 184, 200-201, 243-244 (acknowledging that the only
evidence was created during the IRS examination and in connection with this litigation and
that she did not have personal knowledge of the Debtor's activities); *Debtor's 2008
Handwritten Outlook Calendar*, Joint Exhibit 31; *Debtor's 2008 Additional Handwritten
Calendar*, Joint Exhibit 32; *Debtor's 2008 Monthly Calendar*, Joint Exhibit 33; *Debtor's
2008 Weekly Calendar*, Joint Exhibit 34; *Williams Testimony, Trial Transcript, June 2,
2017*, ECF 1354 at 47-52, 75 (Debtor was not involved in the creation of the records that
were represented to be the time spent on his QREP activities, he did not approve them,
and he has no recollection of them).  Debtor did not separately track the time he spent on
any work performed in connection with the Rental Real Estate Entities, Leasco
Management or Leasco 405DW, Inc.  *Id*.  When asked to identify any specific project that
he worked on in 2008, Debtor could not recall the time he spent on any one project.
*Williams Testimony, Trial Transcript, June 2, 2017*, ECF 1354 at 56-57, 75-76.

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1       I.       **South Coast Home Furnishing Center**

2       142.    After liquidating a substantial number of real estate investments in 2006,

3   Debtor reinvested the funds in new real estate, including a retail shopping center known

4   as South Coast Home Furnishings Center ("South Coast Center").  *Williams Trial*

5   *Declaration*, ECF 1348, ¶¶ 51-52.

6       143.    South Coast Center was a brand new 300,000 square foot retail center

7   located in Costa Mesa, in the same town as the Leasco office and near Debtor's home in

8   Newport.  *Williams Trial Declaration*, ECF 1348, ¶ 53.

9       144.    Debtor purchased South Coast Center with about twenty to thirty tenants,

10  including Wickes Furniture ("Wickes").  *Williams Trial Declaration*, ECF 1348, ¶ 55.

11      145.    After purchasing South Coast Center, Debtor learned that many retailers

12  struggled to pay rent, including Wickes, which eventually filed a bankruptcy case.

13  *Williams Trial Declaration*, ECF 1348, ¶¶ 56-57.  Following the Wickes bankruptcy,

14  multiple other businesses at South Coast Center shut down.  *Williams Trial Declaration*,

15  ECF 1348, ¶ 58.

16      146.    Debtor hired a retail property management firm to help market the retail

17  spaces for lease and manage the center.  *Williams Trial Declaration*, ECF 1348, ¶ 63.

18  Debtor regularly communicated with and relied on a real estate attorney to draft the

19  language for the leases.  *Williams Trial Declaration*, ECF 1348, ¶ 63.

20      147.    According to Debtor, the Wickes bankruptcy case itself presented time-

21  consuming problems for him over and above the lack of funds from the failure of tenants

22  of South Coast Center to pay rent.  *Williams Trial Declaration*, ECF 1348, ¶ 64.  Debtor

23  testified that the acquisition of South Coast Center and the problems that he experienced

24  upon acquisition required a substantial amount of his attention and hours in the years after

25  its acquisition in August 2007.  *Williams Trial Declaration*, ECF 1348, ¶ 68.

26      148.    Debtor purchased the South Coast Center property for $98,000,000 in 2007

27  and the lender ultimately sold it for $35,000,000 at a foreclosure sale.  *Williams Trial*

28  *Declaration*, ECF 1348, ¶ 68.  Debtor initially asserted that the foreclosure occurred in

December 2008, *see id.*, while the United States asserted that it occurred in 2009. *See USA's Trial Brief*, ECF 1359 at 30, ¶ 119. However, Debtor later conceded that the South Coast Center property was foreclosed upon in 2009. *See Debtor's Proposed Findings of Fact and Conclusions of Law*, ECF 1360 at 80 (document page 70), ¶ 2 ("the Trustee sale did not occur until 2009") (citing *South Coast Home Furnishing's Year End Work Papers*, Joint Exhibit 154).

149.    On Debtor's Form 1040 for tax year 2008, he included in his 2008 QREP losses a loss resulting from the foreclosure of South Coast Center. *Debtor's Form 1040 2008 Income Tax Return*, Joint Exhibit 2; *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16. The lender for South Coast Center initiated foreclosure proceedings in 2008, but the foreclosure sale did not occur until 2009. *See South Coast Home Furnishing's Year End Work Papers*, Joint Exhibit 154; *Debtor's 2009 Income Tax Return*, Joint Exhibit 8. As a result, any substantiated loss resulting from this foreclosure could be claimed in 2009 and not in 2008. *Miscellaneous South Coast Center Documents*, Joint Exhibit 152 (*see* excerpts from South Coast Center's 2009 tax return showing the disposition date); *see also South Coast Center's 2008 U.S. Return of Partnership Income*, Joint Exhibit 153; *South Coast Home Furnishing's Year End Work Papers*, Joint Exhibit 154; *Executed Pre-Negotiation Agreement re: $84,000,000 Loan from LaSalle Bank, N.A. to South Coast Home Furnishing Center, LLC, dated May 12, 2008*, Joint Exhibit 155; *Correspondence from LaSalle Bank, N.A. c/o Bank of America to Debtor re: $84,000,000 Loan from LaSalle Bank to South Coast Home Furnishing Center, LLC, dated June 6, 2008*, Joint Exhibit 156; *Correspondence from Leasco Management to LaSalle Bank, N.A. re: $84,000,000 Loan from LaSalle Bank to South Coast Home Furnishing Center, LLC, dated June 11, 2008*, Joint Exhibit 157; *Notice of Default for the Amount of $85,297,452.95, dated July 15, 2008*, Joint Exhibit 158; *Substitution of Trustee Substituting Chicago Title Co. Foreclosure Department, dated July 15, 2008*, Joint Exhibit 159; *Stipulation and Order Granting Receiver's Ex Parte Application and Confirming Sale of South Coast Home Furnishing Center, dated November 25, 2008*, Joint Exhibit 160.

-39-

According to the agreement between the lender and South Coast Center signed by Debtor as president of South Coast Center and guarantor dated May 12, 2008, the loan documents remained in full force and effect and interest payable under the loan continued to accrue until the obligations due and owing to the lender in connection with the loan were paid in full. *Executed Pre-Negotiation Agreement re: $84,000,000 Loan from LaSalle Bank, N.A. to South Coast Home Furnishing Center, LLC, dated May 12, 2008*, Joint Exhibit 155. According to the lender in a letter to South Coast Center to the attention of Debtor, dated June 11, 2008, it had not accepted South Coast Center's offer of a deed in lieu of foreclosure because it was conducting its due diligence regarding its options regarding the property, and during this due diligence period, the lender stated that it was expecting that South Coast Center was to keep the loan current in all respects and comply with the other terms of the loan agreement. *Correspondence from LaSalle Bank, N.A. c/o Bank of America to Debtor re: $84,000,000 Loan from LaSalle Bank to South Coast Home Furnishing Center, LLC, dated June 6, 2008*, Joint Exhibit 156. In November 2008, the Superior Court of California approved a stipulation and order for the application of a receiver appointed for the South Coast Center property to sell the property but did not indicate when the sale would take place. *Stipulation and Order Granting Receiver's Ex Parte Application and Confirming Sale of South Coast Home Furnishing Center, dated November 25, 2008*, Joint Exhibit 160. None of these exhibits establish that the loan agreement between the lender and South Coast Center was terminated or that the foreclosure sale of the property transferring any interest that South Coast Center had occurred in 2008 rather than 2009.

150.    During the IRS's audit examination, Debtor's representative, Minna Yang, sent Revenue Agent Drysdale a letter in June 2012 agreeing that South Coast Center was foreclosed upon in 2009 and explaining why Debtor believed he was entitled to claim the deduction in 2008. *June 8, 2012 Letter from Minna C. Yang to Andrew Drysdale*, Joint Exhibit 165 (inadvertently stating 2008). The letter states in relevant part: "[T]he lender initiated foreclosure proceedings in 2008. At the end of 2008, it was clear to the

1   partnership that the lender would not be willing to provide sufficient reprieve with respect

2   to the loan.  Accordingly, the partnership claimed the deduction related to the loan in

3   2008.  However, the foreclosure proceeding was not complete until 200[9].  As there is no

4   current tax consequence, [Debtor] is not opposed to conceding the deduction in 2008 and

5   including it in the loss for 2009." *Id.* at 2.

6   151.    Debtor's NOL claimed on his Form 1040 for tax year 2008 included a loss of

7   $5,504,474 originating from South Coast Center.  *Debtor's Form 1040 2008 Income Tax*

8   *Return*, Joint Exhibit 2; *Debtor's Form 1040 Schedule E for 2008*, Joint Exhibit 16.  This

9   loss amount does not include the $29,728 loss attributable to SCHFC Management, Inc.

10  *Id*.  Based upon the information provided by Debtor and without deciding whether Debtor

11  can substantiate any of the claimed losses attributable to his interest in South Coast

12  Center, the IRS by Revenue Agent Drysdale calculated that Debtor's 2008 NOL

13  attributable to South Coast Center includes a loan amortization loss of $2,152,011.

14  *Drysdale Trial Declaration*, ECF 1337, ¶ 55.

15  152.    While Debtor would be entitled to deduct the amortization for the full tax year

16  in 2008, and assuming Debtor could otherwise substantiate these costs, Debtor deducted

17  his share of the remaining loan amortization costs for the South Coast Center loan

18  ($1,213,717.41, 62.97% of $1,927,453.40) as if the property has been foreclosed upon in

19  2008.  *Drysdale Trial Declaration*, ECF 1337, ¶ 56

20  153.    Debtor testified that he had no knowledge pertaining to the amortization fees

21  or the decision to deduct fees in 2009 as opposed to 2008.  *Williams Testimony, Trial*

22  *Transcript, June 2, 2017*, ECF 1354 at 58:1-9.

23  **J.    Additional Adjustments to the 2008 NOL**

24  The United States argues that even if Debtor qualifies as a QREP and is entitled to

25  relief under Rev. Proc. 2011-34, adjustments will still need to be made to the tax liability at

26  issue.  *See Drysdale Trial Declaration,* ECF 1337, ¶¶57-67.  The court acknowledges that

27  adjustments will need to be made in the final determination of the IRS's tax claim based

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**

1  on its rulings in Phase 1 and Phase 2, and that these adjustments should be made in

2  Phase 2.

3      IT IS SO ORDERED.

4                                          # # #

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Date: April 8, 2019                     _____

25                                          Robert Kwan
                                           United States Bankruptcy Judge

26

27

28

**FINDINGS OF FACT ON PHASE 1 OF TRIAL**